**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TRICIA REMENTER,** | **CIVIL ACTION** |
|         **Plaintiff,** | |
| | |
|     **v.** | |
| | |
| **KELLOGG COMPANY and,** | **NO.  14-1340** |
| **KELLOGG USA INC.,** | |
|         **Defendants.** | |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

Plaintiff Tricia Rementer alleges in this employment discrimination action that

Defendants Kellogg Company and Kellogg USA Inc. (together, "Kellogg") violated her rights

under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.; the Pennsylvania

Human Relations Act, 42 Pa. Cons. Stat. § 951 *et seq*.[1]; and, under Pennsylvania state law, is

liable for intentional infliction of emotional distress and negligent hiring.  Plaintiff alleges that

while she was employed at Kellogg she was subjected to hostile work environment sexual

harassment and retaliation culminating in the termination of her employment in March 2012.

Defendants have filed a motion for summary judgment on every claim.

## II.    FACTUAL BACKGROUND

### A.    *Plaintiff's Job Function*

Plaintiff began working for Kellogg in March 2006 as a Territory Service Representative

("TSR").  Joint Appendix ("JA") 310.  In June 2009, she moved into the role of Retail Sales

Manager ("RSM") in the Eastern Zone of the Direct Store Delivery ("DSD") Snacks Division.

She remained as an RSM until March 5, 2012, when she was fired.

---

[1]    The Third Circuit treats Title VII and PHRA claims coextensively.  *Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir. 1996).

As an RSM, Plaintiff's primary function was to "sell and manage the merchandising of Kellogg DSD products within a specified geographic area to deliver quarterly/yearly sales budget and growth targets." JA 35.  As such, her job was to develop business relationships with individual stores in her region, *e.g.*, Target, ACME, Pathmark, *etc.*, to place Kellogg's snack products on these client stores' shelves and thereby grow Kellogg's sales according to specified metrics.  To accomplish these goals, Plaintiff managed TSRs and part-time workers ("PTWs") to handle inventory and merchandising duties, among other responsibilities.  JA 35-37.  More specifically, she was responsible for holding TSRs and PTWs accountable for proper inventory rotation and levels; establishing rapport with store management; partnering with her District Managers ("DMs") to "improve delivery efficiencies and optimize customer service levels"; and assisting with merchandising when necessary, including building displays, rotating product, merchandising on shelves, *etc*.  *Id.*

Kellogg's DMs evaluate an RSM's performance by conducting "coaching trips" or store visits to obtain a visual understanding of how well an RSM is managing product within a client store and to meet with the client store managers to assess their needs and the relationships with their RSMs.  *See, e.g.*, JA 5, 38, 45-47, 101.  An RSM's relationship with her client store managers is critical to her success at Kellogg as the company maintains a long-standing policy of discharging DSMs who are "fired" from any of the client stores they service.  JA 6, 17, 57.  In some instances, if a client store manager threatens to fire an RSM, the DM will attempt to convince the manager to withdraw the request.  *See, e.g.*, JA 183, 219.  However, if the client store manager is not persuaded to let the RSM continue serving the client store, the RSM is terminated from Kellogg.  *Id.*

B.    *Plaintiff's Work History*

During her tenure as an RSM, Plaintiff was supervised primarily by three DMs:  James

Kern (2009-2010), Mark Vaspoli (2011), and Joseph Tricome (late 2011-2012).  Each of these

DMs documented similar concerns concerning Plaintiff's performance.  In 2009, 2010, and 2011,

Plaintiff received a year-end performance grade of "C – Did Not Meet Expectations."  JA 44, 48-

50, 200, 226, 296-97.  Moreover, Plaintiff was threatened with removal from client stores while

reporting to each of her three DMs.  JA 39, 45, 57, 154.  Until the last demand for removal from

a client store in March 2012, Plaintiff's DMs were able to persuade the stores to allow Plaintiff

to continue.

### 1.    Performance under James Kern (2009-2010)

On September 3, 2009, shortly after starting in her RSM role, James Kern, Plaintiff's DM

and direct supervisor, issued her a memo informing Plaintiff that he was "very concerned about

proper communication levels on [her] territory" and noting that there had been "complaints and

orders refused" at "66% of [Plaintiff's] total business."  JA 38.

On October 19, 2009, Kern issued Plaintiff a memo notifying her that "over the past

several months there have been instances of running out of product or ordering wrong product

into the [Pathmark Frankford Avenue] store . . . ."  JA 39.  Kern further advised Plaintiff that

"the store will no longer tolerate what they view as poor service."  *Id*.  Kern specifically noted to

Plaintiff that if she were removed from the store "company policy states that you cannot

sufficiently fulfill the obligation for your job and action will be taken up to termination."  *Id*.

At the end of 2009, Kern rated Plaintiff's performance "C – Did not meet expectations."

JA 40-44.

In October 2010, Kern conducted a "coaching trip" of three of Plaintiff's client stores and

documented his findings in a memo to Plaintiff.  JA 45-47.  In the memo, Kern highlighted

3

feedback he received, including "lack of communication" with the client store managers; a grade of 5/10 for service issues with ordering product, communication and follow through; and, significantly, a request by Wal-Mart Franklin Mills to replace Plaintiff as the service manager for that store.  *Id.*  Kern noted that he spoke to the manager and was able to avoid having Plaintiff removed as the sales representative for that store.  *Id.*

At the end of 2010, Kern again rated Plaintiff's performance "C – Did not meet expectations."  JA 48-50.  In Plaintiff's evaluation, Kern wrote that Plaintiff "has not had a successful year in 2010 in the area of metric accomplishments, including driving sales, managing inventory and variable labor use."  JA 49.  Kern further stated that Plaintiff had "poor communication with several store managers" that led to "missing additional selling opportunities," and that she offered "poor planning and direction to TSRs and PT[W]s," thereby overusing her variable labor hours."  *Id.*

### 2.    Performance Under Mark Vaspoli

In early 2011, Mark Vaspoli took over as Plaintiff's DM.  JA 263.

On April 4, 2011, Vaspoli sent Plaintiff an email documenting his observations from a visit to one of Plaintiff's client stores.  JA 51-53.  Vaspoli noted that the "back stock was out of control, unorganized and over loaded" and that the "receiver was totally upset and disappointed with us."  *Id.*

On June 15, 2011, Vaspoli sent Plaintiff an email addressing various problems with her work and noting that her "next follow up will be a written PIP [Performance Improvement Plan] if these issues are not addressed."  JA 133-34.  Vaspoli copied his supervisor, Zone Manager John Keane, on his email to Plaintiff.  *Id.*  That same day, Vaspoli emailed Trish Burgett,

Kellogg's Senior Employee Relations Specialist, that he would "like to move forward and put Trish on a PIP." JA 132-34.

On June 16, 2011, Burgett forwarded Vaspoli's June 15, 2011 email to Melanie Blumberg in Human Resources, noting that Vaspoli "stated he has concerns about [Plaintiff's] performance and wanted me to review what he has so far to see if we are ready to progress to a PIP." JA 132. Burgett then responded to Vaspoli by email and asked if he had "more documentation" regarding Plaintiff, including her year-end performance review for 2010. JA 135. In the same email, Burgett advised Vaspoli to "see how [Plaintiff] reacts" to his June 15, 2011 email and "[g]ive her a couple of weeks to complete the deliverables." *Id.*

On June 20, 2011, Plaintiff complained to Blumberg about issues she was having with Vaspoli. JA 102. Plaintiff complained that Vaspoli was "always out on [her] territory" and was "undermining [her] in [her] stores." JA 13. As an example of this behavior, Plaintiff discussed "the way [Vaspoli] would talk to [her] in the stores and how [she] was running [her] stores." *Id.* Finally, Plaintiff complained (and no one disputes) that Vaspoli continued to refer to her as "girlfriend" on several occasions despite Plaintiff's request that he stop it. JA 23. At no point did Plaintiff complain about conduct by Vaspoli of a sexual nature. JA 28, 30-31.

Following her meeting with Plaintiff, Blumberg reported Plaintiff's complaints to Zone Manager Keane, who then counseled Vaspoli on "speak[ing] to everybody professionally" and instructed him to stop addressing her as "girlfriend." JA 93, 177, 266. Vaspoli apologized to Plaintiff and stopped using the term "girlfriend." JA 23, 266.

On June 24, 2012 Vaspoli sent an email to Blumberg and Keane seeking guidance concerning how to respond to Plaintiff, who had just complained that her knee was hurting, given that the injury could potentially be work-related. JA 289. Vaspoli noted: "I do not like

'Managing on [e]gg shells' but understand that I need to manage her differently." *Id*.  Plaintiff's knee pain did not become a further issue.

In August 2011, one of Plaintiff's stores threatened to "throw [her] out for poor performance," which Vaspoli and Keane explained to Plaintiff would, under Kellogg's policy, result in her termination if they were unable to convince the store manager to change his mind. JA 57-63.  On August 22, 2011, Vaspoli and Keane met with the store manager to discuss the store's concerns regarding Plaintiff's work quality.  *Id*.  Keane subsequently drafted a letter to Plaintiff describing his conversation with the store manager.  *Id.*  Keane noted that the client "was again concerned with [Plaintiff's] ability to effectively manage his store" and noted that "his biggest issue was [Plaintiff's] lack of responsiveness" with regard to delivery issues.  *Id.*  Keane further noted that he had visited additional stores serviced by Plaintiff and found one of them to be "in very bad shape from a merchandising perspective." *Id.*  Keane added that "this continues to be a trend with your stores.  This is another case of poor ordering, and ability to manage the account effectively." *Id*.

On September 7, 2011, Plaintiff met with Blumberg and Keane to "review the status of her performance" and discuss ways she could improve.  JA 94.  Following that meeting, Plaintiff was provided with a "Retail Sales Manager Best Practices Tool Kit," which was designed to assist Plaintiff in improving her performance.  JA 19, 94-95, 105-122.

On October 9, 2011, Vaspoli copied Blumberg on an email exchange with Plaintiff in which he chastised Plaintiff for not handling an issue at a Genuardi's supermarket over the weekend.  JA 140-44.  Vaspoli wrote: "Trish, [t]hanks for getting back with me…..in the time you took composing the email [to me,] you could have reached out to Dave and serviced your customer. . . .  [I]t is your responsibility to assist your customers, even on your day off if you

have not properly communicated to him or the store with any issues or problems . . . so they are informed." *Id.*

Two days later, Plaintiff reached out to Burgett. JA 138. Plaintiff complained that she still had "ongoing issues" with Vaspoli and stated that "things were escalating not getting better." *Id.* Plaintiff told Burgett that Vaspoli told her she was "the worst" RSM in her district and described the incident on October 9. *Id.* Burgett's notes from that conversation indicate that a "[r]eview of [Plaintiff's] metrics indicate she *is* near/at the bottom of most metrics." *Id.* (emphasis added). Burgett also "warned [Plaintiff] that [by not attending to Vaspoli's request on October 9] she was defying a direct request from her manager, which could be considered insubordination." *Id.* At no point during this conversation did Plaintiff complain that Vaspoli was harassing her in a sexual manner.

On October 31, 2011, Vaspoli contacted Human Resources to request again that Plaintiff be placed on a PIP. JA 283. That request was reviewed and approved. *Id.*

On November 3, 2011, Plaintiff was placed on a 90-day PIP. JA 82-86. As part of the 90-day PIP, Vaspoli was required to review Plaintiff's progress after thirty days. On December 14, 2011, Vaspoli attempted to send an email to Blumberg, Burgett, and Keane to give a "quick up-date on Tricia Rementer's 90 PIP." JA 145-46. Vaspoli noted that he had "been keeping weekly notes on issues and things that have been popping up over the past 4 weeks." *Id.* Vaspoli's email also notes: "I also have attached the powerpoint document on our meeting with the Genaurdi's [sic] team. As you will see he wanted her replaced and I got her back into the store with this program that I set up for her. There are many refusals that have come out of her stores over the past 30 days that I am currently pulling info on but I have over 6 so far." *Id.* Vaspoli concluded that "based on this info alon[e] I am recommending that we term[inate] but

will wait to hear your thoughts.  I am not seeing any improvements, I actually think she has given up at this point." *Id.*

Later that day, Vaspoli noticed that he had "screwed up" and sent the email recommending Plaintiff's termination to an RSM named John Kent (one of Plaintiff's peers) instead of his boss and intended recipient, John Keane.  JA 147.  Vaspoli explained that he asked Kent to delete the email concerning Plaintiff and not discuss it with anyone.  JA 151.  However, the email was not contained and Plaintiff and her peers became aware of the email and its contents.  *Id.*  Due to this incident, Vaspoli was removed as Plaintiff's DM.

### 3.    Performance Under Joe Tricome

Joe Tricome took over as Plaintiff's DM in December 2011.  JA 152.  Tricome testified at his deposition that Keane asked him to take over managing Plaintiff because of "an issue with an email sent out inadvertently."  JA 215.  Tricome noted that he "wasn't privy to what the email said, the content, who got it or what happened, but [Keane] felt that in fairness to [Plaintiff] that it would probably be best to remove Mark [Vaspoli] from that situation and have me manage her."  *Id.*

The record indicates that in order to effectuate the transition, Tricome met with Vaspoli and Keane.  During that meeting, Tricome learned that Plaintiff was on a PIP.  JA 216.  Tricome did not recall being told that Plaintiff made complaints to Human Resources on her own behalf. *Id.*  Regarding Plaintiff's complaints concerning Vaspoli, Tricome testified: "I don't really know that I was aware that [Plaintiff] had made complaints about [Vaspoli].  I was just brought into this because of the erroneous email and the subsequent chain of events that for fairness sake – if you want to use that word – they wanted me to be more – they wanted a[n] objective person viewing – managing [Plaintiff]."  *Id.*

At the end of 2011, Plaintiff's Performance Management Form showed a rating of "C – Did not meet expectations."  JA 226.

On January 3 and 4, 2012, Tricome conducted a two-day visit to Plaintiff's stores. JA 217, 228-49.  Tricome documented his visit, noting, among other things, that "[b]ack [s]tock was excessive and piled in an un-safe manner," "outdated product was on shelf," "back stock was heavy with sixty (60) pieces and it is the wrong items," "[Plaintiff's] car [was] parked contrary to company policy."  JA 228-49.  Tricome spoke with the Assistant Manager of one of Plaintiff's client stores, who expressed "concerns about [Plaintiff's] work ethic and ability." JA 235.  Tricome concluded his evaluation by noting, "Trish[, in] the two (2) days I spent on your territory there were not too many positives."  JA 236.  Tricome testified that this two-day field visit was the only time he worked with Plaintiff.  JA 217.

On January 5, 2012, Plaintiff attended a 30-day follow-up meeting with Tricome and Vaspoli concerning her PIP.  JA 280-81.  Plaintiff objected to Vaspoli's presence.  *Id.*  Vaspoli testified at his deposition that he attended the meeting because he wrote the PIP document, but that he intended to let Tricome take over with respect to the 60 and 90-day follow-ups.  *Id.* Tricome testified that he was aware that Plaintiff did not want Vaspoli to attend the meeting.  JA 217.  Tricome further testified that he did not understand why Vaspoli attended, and he did not find out why Plaintiff did not want Vaspoli there.  *Id.*

On or around January 19, 2012, Plaintiff took administrative leave.  JA 283.

On February 3, 2012, Tim McHugh, a store manager for the Pathmark on Frankfurt Avenue, requested that Plaintiff no longer service his store.  JA 154.  The facts surrounding McHugh's request are in dispute.  Tricome testified that he received word from Tim Carolan, the TSR who had taken over Plaintiff's role while she was on administrative leave, that McHugh

wanted to speak with him. JA 218. After Carolan told him that the request was urgent, Tricome drove to the Pathmark to meet McHugh in person. *Id.* Tricome testified that when he arrived at the store, he met McHugh and two other individuals, who were "just generally upset with our service, stale product, back stock, and it was an ongoing issue." *Id.* Tricome testified that McHugh told him that "he had had these issues before with Trish. He had thrown her out of the store before and let her back in and he had had it and that was it. He wanted another sales rep. And he understood that she was currently out and that [Carolan] was running the territory and he said when she comes back, he didn't want her back." *Id.* Tricome noted that he did not attempt to talk Plaintiff back into the store. JA 219. In his words, "they were irate and it was not a pleasant conversation." *Id.* Tricome's contemporaneous email to Burgett and Blumberg provides the same narrative. JA 250-51 ("Tom will not allow [Plaintiff] back in his store. He said he understood that she was currently out, and insisted that when she come back, she could not service his store.").

McHugh testified that although he does not recall who initiated the phone call, he remembers that he "complained first about [Plaintiff's] service" and that he told Plaintiff's supervisor at the time "to get somebody else because she wasn't doing her job." JA 203-04. When asked what was wrong with Plaintiff's performance, McHugh testified that "the service was poor" and that "the shelves [were] empty" and "[did] not hav[e] sale items [on them]." *Id.* McHugh reiterated that the reason he requested Plaintiff's removal was that "the shelves [were] empty, [Plaintiff's] not bringing product in, I'm losing sales. It's as simple as that. I can't make it any simpler." JA 203-05. McHugh further explained that his request was based upon a "continuous" period of poor service, stating "I'm not going to kick somebody out because one day I walked down and the shelf is empty. Things happen, the truck was late or whatever. It's

10

over a period of time." JA 204-05.  When asked why he complained about Plaintiff while she

was out on administrative leave, McHugh speculated that his complaint would have been:

> [a]typical on the point if it was the first offense or something like that.  If it had
> been going on over a period of time, yeah, I would complain about it, because,
> obviously, if she was out for 60 days, I probably wouldn't want her back at that
> point, since she wasn't there for 60 days.  And if I noticed a better result in
> service and appearance of product on the shelf, I would make a recommendation
> that I don't want her back in that case, because, obviously, the fill-in did a lot
> better job.

JA 207.  However, McHugh could not recall if that was what specifically happened in Plaintiff's

case.  *Id.*

Plaintiff speculates that the episode with McHugh was not initiated by McHugh, but,

rather, by Tricome.  To summarize Plaintiff's version of the events, Tricome deliberately sought

out information from Plaintiff's former supervisor, Kern, as to which store would be likely to

request Plaintiff's removal.  *See* Opp'n at 4.  Having learned from Kern that McHugh would

likely make this request, Tricome then solicited Plaintiff's removal from McHugh and thereby

ensured her termination.  *See id.*  Kern's testimony supports Plaintiff's narrative.  Kern testified

that at some point in time, Tricome contacted him regarding Plaintiff "looking for stores that

would kick [Plaintiff] out." JA 191.  Kern further testified that Tricome told him "HR was

taking a long time to get rid of her and this got dumped into his lap." *Id.*  Defendants challenge

Kern's credibility as a witness given the fact that he was also terminated from Kellogg and filed

a lawsuit against Defendants for unlawful discharge.  Reply at 5.

On March 5, 2012, Plaintiff returned from administrative leave.  JA 131.  Tricome met

her at one of her stores and advised her that she was terminated.  Plaintiff responded that this

decision "doesn't come as any surprise." JA 27.

## III.    LEGAL STANDARD

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 345 (2010) (citations and internal quotation marks omitted). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). A fact is material if it might affect the outcome of the suit under the governing law. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). "The reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-LaRoche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (alteration in original) (quoting *Anderson*, 477 U.S. at 252). In other words, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Id*. (citing *Celotex*, 477 U.S. at 322-26).

**IV.    DISCUSSION**

### A.      *Sexual Harassment / Hostile Work Environment*

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his or her compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000-2(a).  To maintain a hostile work environment sexual harassment claim under Title VII as Plaintiff seeks to do here, she must establish that: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability.  *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990).

With respect to the first element, Plaintiff argues that the evidence supports a finding that Mark Vaspoli intentionally discriminated against her because of her sex by: (1) appearing at Plaintiff's store unannounced to meet with her; (2) requesting that she provide him with an itinerary of "everything that needed to be done at the stores in her territory prior to her vacation"; (3) asking her to sit next to him at business meetings; (4) routinely disparaging her to store managers in her territory by making statements that she could not do her job because she was female; and, (5) repeatedly referring to her as "girlfriend" during his first few months as her supervisor.  *See* Opp'n at 7.  Defendants argue that Plaintiff has not established the first element of her hostile work environment claim, in some instances because the record does not support Plaintiff's contention that Vaspoli took the actions she claims he did, and, in any event, because Plaintiff has produced no evidence that Vaspoli's actions constitute intentional gender discrimination.  Mot. at 13-14; Reply at 2-3.

A review of the record supports Defendants' conclusion.  Aside from her own assertions that Vaspoli treated her differently than her male counterparts because she is a woman, *see, e.g.*, JA 3, 14, 30-31, Plaintiff has pointed to no direct or circumstantial evidence that gender was a "substantial factor" in how she was treated.  *Andrews*, 895 F.2d at 1485 (holding that to make out a case under Title VII, Plaintiff must show "that gender is a substantial factor in the discrimination, and that if the plaintiff 'had been a man she would not have been treated in the same manner.").  Plaintiff concedes that Vaspoli never said anything to her of a sexual nature or touched her in a sexual manner.  JA 28.  Although "[t]o constitute impermissible discrimination, the offensive conduct is not necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally affect a female employee," Plaintiff must, nevertheless, establish other conduct reflecting "[i]ntimidation and hostility toward women *because they are women*."  *Andrews*, 895 F.2d at 1485 (emphasis added).  She has not done so.

With respect to Plaintiff's allegations that Vaspoli "nitpicked" or "undermined" her by appearing at her stores unannounced or requiring an itinerary before she took leave, *see, e.g.*, JA 14, Plaintiff's deposition reveals that she bases her conclusion that Vaspoli treated her differently than her male counterparts on a handful of conversations with three of the twelve RSMs under Vaspoli.  JA 29.  Significantly, Plaintiff admitted that she has no other evidence that Vaspoli treated men in her district with similar work performance differently.  *Id*.  Plaintiff further admitted that she does not know if Vaspoli appeared at any of her peer RSM's stores unannounced, and she did not see any documents that her peer RSMs gave Vaspoli before taking vacation and therefore does not know the level of detail Vaspoli required of his male RSMs.  JA 29-30.  Nor has Plaintiff pointed to any record evidence from any other RSMs working under

Vaspoli, male or female.  Thus, Plaintiff has failed to show that Vaspoli's attention to her work performance was substantially different from his attention to Plaintiff's male colleagues.

Moreover, even if Plaintiff's testimony that Vaspoli treated her differently were true, Plaintiff has failed to establish that the reason Vaspoli treated her differently was due to her gender and not a non-discriminatory reason such as Plaintiff's documented poor performance. Indeed, the record shows that Plaintiff had consistently received negative feedback and reviews from her supervisor dating back to 2009, when she was supervised by Kern, *see, e.g.*, JA 38-39, 40-44, 45-47, which continued when she was supervised by Vaspoli in 2011.  *See, e.g.*, JA 51, 54-56.  In addition, Plaintiff received critical feedback from Keane, Vaspoli's direct supervisor. *See, e.g.*, JA 57-63.  Given this record evidence, Plaintiff's conclusion that Vaspoli treated her differently because of her gender is untenable.

Turning to Plaintiff's allegation that Vaspoli requested that Plaintiff sit next to her at meetings, Plaintiff has produced no evidence that Vaspoli's actions were intended to sexually harass or intimidate her.  To the contrary, at her deposition, Plaintiff admitted that Vaspoli never touched her at those meetings, and she never asked him why he wanted her to sit next to him. JA 28.  Furthermore, Plaintiff conceded that in all but one instance Plaintiff and Vaspoli were the only two people present at the meeting, and Vaspoli merely invited Plaintiff to sit in the chair next to his.  JA 28-29.  Even if true, then, Plaintiff's allegations do not amount to intentional discrimination based on her gender, and, given the evidence adduced by Plaintiff, did not occur at a frequency great enough to constitute a "pervasive and regular" condition of Plaintiff's work environment.  *Andrews*, 895 F.2d at 1482.

Plaintiff's allegation that Vaspoli "routinely disparaged her" to store managers is equally unsupported by the record.  At her deposition, Plaintiff could only identify one store manager to

15

whom she claims Vaspoli disparaged her, and despite working with this manager "for the entire time [she has] been on the territory," Plaintiff could not recall his name.  JA 14.  Moreover, Plaintiff admitted that she was not privy to any particular conversation between Vaspoli and this manager, but merely heard from her colleagues that "[Vaspoli] would talk about[her] behind [her] back."  *Id.*  Plaintiff did not attempt to obtain a statement from this, or any, manager and has pointed to no admissible evidence in the record that Vaspoli in fact made such statements.  Thus, Plaintiff has failed to establish intentional discrimination relating to any such comments.

Finally, with respect to Plaintiff's allegation that Vaspoli frequently referred to her as "girlfriend," the record does support a conclusion that Vaspoli used the term "girlfriend" over the course of several months and that Plaintiff was upset by it.  JA 23, 92, 266.  However, even if Vaspoli's habit was offensive, annoying and undoubtedly unwelcome, it stopped as soon as she brought it up with HR and HR read him the riot act.  JA 28.

Having concluded that Plaintiff cannot establish a prima facie case with respect to any of her allegations of intentional discrimination, the Court will grant Defendants' motion with respect to her hostile work environment claim.

### B. *Sexual Harassment / Retaliation*

Plaintiff's claims of unlawful retaliation under Title VII must be analyzed under the burden-shifting paradigm established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Under that standard, to succeed on her claim of unlawful retaliation, Plaintiff must demonstrate: (1) she engaged in an activity protected by Title VII; (2) after or contemporaneous with engaging in that conduct, Defendant took an adverse action against her; (3) the adverse action was "materially adverse"; and (4) a causal link exists between her participation in the protected activity and the Defendants' adverse action.  *Hare v. Potter*, 220 F. App'x 120, 127 (3d Cir. 2007).  If Plaintiff establishes a prima facie case, and Defendants point to a non-

discriminatory reason for the materially adverse action, the burden shifts back to Plaintiff to prove that the non-retaliatory or non-discriminatory reason is merely a pretext for discrimination. *Id.*

Here, Plaintiff has failed to adduce evidence in support of her prima facie case of retaliation. Even assuming *arguendo* that Plaintiff engaged in protected activity by complaining to Blumberg about Vaspoli on June 20, 2011, *see* Opp'n at 11-13, the evidence does not support a causal connection between that activity and the two materially adverse actions identified by Plaintiff, *i.e.*, her placement on a PIP in November 2011 and ultimate termination in March 2012.[2] To demonstrate a link between a protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if "unusually suggestive" of retaliation. *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196-97 (3d Cir. 2015) (citations omitted). In the absence of such a close temporal proximity, the Court may consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action. *Id.* (citations omitted). The plaintiff, however, cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted. *Id.* And, above all, "each case must be

---

[2]     There is some disagreement among the parties as to what specifically Plaintiff contends are the materially adverse actions Defendants took against her. However, it appears from Plaintiff's sur-reply memorandum that she identifies two events as materially adverse: (1) "placement of the Plaintiff on a PIP," which, (2) "ultimately led to her termination." Sur-Reply at 3. Defendants argue that Plaintiff's placement on a PIP was not a materially adverse employment action because it did not alter the conditions of her employment. Reply at 3. "Materially adverse" in the context of a retaliation claim means an action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Hare*, 220 F. App'x at 128 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006); *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006)). "Stated differently, a plaintiff may meet her burden by demonstrating that her employer's conduct is "likely to deter victims of discrimination from complaining to the EEOC." *Id.* (citation omitted). Thus, although the terms of Plaintiff's employment were not changed by being placed on the PIP, the fact that at least some Kellogg employees regarded a PIP as the "kiss of death" is sufficient to raise a genuine issue of material fact as to whether the threat of being put on a PIP might dissuade a reasonable worker from filing a complaint. *See* JA 166, 192.

considered with a careful eye to the specific facts and circumstances encountered." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000).

Turning first to Plaintiff's placement on a PIP, the record indicates that the temporal proximity between Plaintiff's conversation with Blumberg about Vaspoli on June 20, 2011 and her placement on a PIP on November 3, 2011, four and a half months later, is not "unusually suggestive." Looking at the record as a whole, it is clear that Vaspoli sought to place Plaintiff on a PIP *prior* to the time she engaged in any protected activity and reiterated his request only after several more months of documented poor performance. Indeed, on June 15, 2011, Vaspoli sent Plaintiff an email addressing various problems with her work and noting that her "next follow up will be a written PIP if these issues are not addressed." JA 14, 133-34. That same day, Vaspoli wrote to Burgett in Human Resources that he would "like to move forward and put Trish on a PIP." JA 132-134. Following Plaintiff's June 20, 2011 contact with Blumberg, however, Vaspoli followed Blumberg's instructions and continued to provide Plaintiff with "coaching/feedback and monitor [her] performance." JA 283. However, Plaintiff's performance did not improve. *See, e.g.*, JA 57 (Aug. 22, 2011 memo from Keane to Rementer summarizing Keane and Vaspoli's discussion with Plaintiff's client at Giant on Grant Avenue after he had threatened to "throw [Plaintiff] out for poor performance"); JA 140-44 (Oct. 9, 2011 email exchange between Vaspoli and Rementer, copying Blumberg, concerning Plaintiff's refusal to personally attend to an issue at one of her stores over the weekend); JA 138 (Feb. 27, 2012 email from Burgett noting that a "[r]eview of [Plaintiff's] metrics indicate she *is* near/at the bottom of most metrics."). Thus, on October 31, 2011, *four months* after his initial request, Vaspoli requested again that Plaintiff be placed on a PIP. JA 283. That request was reviewed and approved by Human Resources. *Id.* Given the aforementioned chronology, it is clear that

18

Vaspoli's actions, though perhaps designed to cause Plaintiff's termination, were not taken in retaliation for Plaintiff's alleged protected activity.

As for her termination, Plaintiff argues that there is a dispute of material fact as to: (1) whether the termination was motivated solely by the complaining Pathmark store manager, John McHugh, or (2) whether Plaintiff's manager at Kellogg at the time, Joe Tricome, actively brought about her removal by asking Plaintiff's former boss, Jim Kern, which stores were unhappy with Plaintiff and prompting McHugh to request Plaintiff's replacement.  Sur-Reply at 2.  While the record may reflect a dispute as to who initiated the conversation between Tricome and McHugh concerning Plaintiff's removal from the Pathmark, that dispute is not material. Even if Tricome went out of his way to cause Plaintiff's termination, there is no record evidence that he knew about Plaintiff's protected activity, *see* JA 00216, let alone sought to have Plaintiff removed in retaliation for such activity.  Nor is there any evidence that anyone at Kellogg who knew of Plaintiff's protected activity directed Tricome to seek Plaintiff's removal.  Thus, even if it were the case that Tricome deliberately sought Plaintiff's termination for reasons of his own, there is no record evidence to support Plaintiff's claim that he did so in retaliation for her protected activity.  *See Daniels*, 776 F.3d at 196-97.  Accordingly, Defendants' motion for summary judgment on Plaintiff's retaliation claim is granted.

### C.      *Intentional Infliction of Emotional Distress*

Defendants also move for summary judgment with respect to Plaintiff's claim for intentional infliction of emotional distress ("IIED").  Such a claim requires, "at the least, [a demonstration of] intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff."  *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005).  Moreover, "a plaintiff must suffer some type of resulting physical harm due to the defendant's outrageous conduct."  *Id.*; *see also Reedy v. Evanson*, 615 F.3d 197, 231 (3d Cir.

19

2010) (discussing Pennsylvania law regarding intentional infliction of emotional distress claims). As the Third Circuit has observed, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for [IIED]." *Andrews*, 895 F.2d at 1487 (citing *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988)).  "[A]s a general rule, sexual harassment alone does not rise to the level of outrageousness necessary to make out a cause of action for [IIED]." *Id.*  Indeed, "the only instances in which courts applying Pennsylvania law have found conduct outrageous in the employment context is where an employer engaged in both sexual harassment and other retaliatory behavior against an employee." *Id.* (citation omitted).  And even then, "[t]he extra factor that is generally required is retaliation for turning down sexual propositions." *Id.* (citation omitted.  As discussed herein, Plaintiff has not alleged that she was sexually assaulted or harassed by any of her supervisors.  Moreover, for the reasons stated above, Plaintiff has not raised a genuine issue of material fact to avoid summary judgment in favor of Kellogg on her hostile work environment and retaliation claims.  The facts surrounding Plaintiff's termination alone are insufficient to carry her IIED claim under Pennsylvania law.  Accordingly, the Court will grant summary judgment in favor of Defendants on that claim.

   **D.**   ***Negligent Hiring / Training***

   Finally, Plaintiff concedes that Defendants are entitled to summary judgment on her claims for negligent supervision and negligent training of employees.  Accordingly, judgment will also be entered in Defendants' favor on that count.

## V.    CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment is granted.  An appropriate order will follow this opinion.


**Dated:  October 1, 2015**

                                                        **BY THE COURT:**

                                                        **/S/WENDY BEETLESTONE, J.**

                                                        _____

                                                        **WENDY BEETLESTONE, J.**